

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

NO. AP-76,207

JAMES GARFIELD BROADNAX, Appellant

v.

THE STATE OF TEXAS

On Direct Appeal from the
Criminal District Court No. 7 of
Dallas County

WOMACK, J., delivered the opinion of the unanimous Court.

In January, 2009, a jury convicted the appellant of the murder of Stephen Swan in the

course of committing robbery, which is a capital offense.[1] Pursuant to the jury's findings on

future-dangerousness and mitigation special issues,[2] the trial court sentenced the appellant to

---

[1] *See* TEX. PENAL CODE § 19.03(a)(2).

[2] *See* TEX. CODE CRIM. PROC. art. 37.071 § 2(b)(1), (e)(1).

death. On direct appeal to this Court,[3] the appellant raises fifty-six points of error. Finding no reversible error, we affirm the judgment and sentence of the trial court.

## I. BACKGROUND

A man riding his bicycle home from work saw the bodies of Stephen Swan and Matthew Butler in the street outside their recording studio in Garland shortly after 1:00 a.m. on June 19, 2008. The man alerted Garland firefighters at a nearby fire station. Upon arriving at the scene, the firefighters quickly determined that both Swan and Butler were recently deceased. At the appellant's trial, the medical examiner testified that Swan had suffered an intermediate-range gunshot wound to the head, in addition to a gunshot wound to the left chest.

Later that day, the appellant and his cousin, Demarius Cummings, arrived at the Southeast Dallas apartment where the appellant had been staying with family members. While there, the appellant boasted of "hit[ting] a lick" – street slang for committing a robbery – and displayed Swan's driver's license. The appellant and Cummings left the apartment in Swan's Ford Crown Victoria, after telling those present that they planned to sell the vehicle. Fifteen minutes after the appellant and Cummings left, the appellant's aunt's friend who had been present in the apartment saw news reports of the double homicide. She realized that the appellant and Cummings were likely involved, and she called the Garland Police.

That evening, police officers in Texarkana (which is about 150 miles from Garland) saw Swan's car in a high-crime area. After a check of the license plates returned information for a Cadillac, rather than a Ford, officers pulled the vehicle over. The appellant gave the officers his

---

[3] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(h) ("The judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals.").

name, and after they learned that there were warrants for the appellant's arrest, the officers placed the appellant in custody. The arresting officer testified that the appellant did not appear to be intoxicated when he was pulled over.

After being returned to Dallas, the appellant gave multiple interviews to television broadcasters in the Dallas area. These interviews became the crux of the State's case at trial. In them, the appellant confessed to murdering and robbing Swan and Butler, and he provided explicit details of the crimes. He said that he and Cummings had traveled to Garland that day with the specific intent of committing a robbery. The appellant said that while Cummings had participated in the robberies, the appellant, alone, had murdered the victims. The appellant told reporters that he had no remorse for his actions, and that he hoped a jury would sentence him to death.

At trial, the defense conceded that the appellant had shot Swan and Butler, but argued that the appellant was under the influence of marijuana and PCP at the time of the murders. The defense further posited that the appellant was still intoxicated at the time of his multiple television interviews and confessions four days after his arrest. Several of the State's witnesses were skeptical of the appellant's theory. In addition to the arresting officer's testimony that the appellant was lucid at the time of his arrest, the reporters who interviewed him described the appellant as intelligent and rational. The jail nurse, too, testified that the appellant did not appear to be under the influence of alcohol or drugs.

## II. JURY SELECTION ISSUES

### A. *Batson* Violations

In points of error one through seven, the appellant argues that the State exercised

peremptory challenges to strike six black venire members and one Hispanic venire member in

violation of the Equal Protection Clause of the United States Constitution.  The appellant also

argues that because one *Batson* objection was sustained, the entire jury selection was invalidated.

### 1. Standard of Review

In *Batson v. Kentucky*, the United States Supreme Court held that "the Equal Protection

Clause forbids the prosecutor to challenge potential jurors solely on account of their race ...."[4]

The Supreme Court articulated the procedure for bringing a *Batson* objection in *Purkett v. Elem*:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has
> made out a *prima facie* case of racial discrimination (step one), the burden of
> production shifts to the proponent of the strike to come forward with a race-
> neutral explanation (step two). If a race-neutral explanation is tendered, the trial
> court must then decide (step three) whether the opponent of the strike has proved
> purposeful racial discrimination.[5]

 The ultimate burden of persuasion rests with the opponent of the strike to establish by a

preponderance of the evidence that the strike was the product of the proponent's purposeful

discrimination.[6] Here the State offered race-neutral explanations for the seven challenged venire

members, which the trial court accepted, but the appellant argues that those explanations were a

pretext for racial discrimination. Therefore, the only issue before us is whether the trial court

---

[4] 476 U.S. 79, 89 (1986).

[5] 514 U.S. 765, 767 (1995); *see also Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Cr. App. 2008) (quoting *Purkett*).

[6] *Watkins*, 245 S.W.3d, at 447.

erred in finding that the appellant did not prove purposeful racial discrimination by a preponderance of the evidence.

On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.[7] This deferential standard of review is due to the trial court's ability to make determinations about an attorney's credibility and demeanor: "Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge."[8]

## 2. Analysis

This Court has identified a number of relevant factors that may be considered by a trial court in determining discriminatory intent.[9] The appellant argues one of these factors on appeal: that in response to *voir dire* questioning, the minority venire members who were struck gave answers that were similar to answers given by non-minority venire members who were not struck. Additionally, the appellant argues that because a *Batson* challenge was sustained to one prospective juror, the entire jury selection was invalidated.

## a. Comparative Juror Analysis

In 2009, the United States Court of Appeals for the Fifth Circuit extracted key principles from the United States Supreme Court decision in *Miller-El v. Dretke*[10] to help guide comparative juror analyses:

---

[7] *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); *see also Gibson v. State*, 144 S.W.3d 530, 533-34 (Tex. Cr. App. 2004).

[8] *Snyder*, 522 U.S., at 478 (citing *Hernandez v. New York*, 500 U.S. 352 (1991)).

[9] *See, e.g., Watkins*, 245 S.W.3d, at 448-49; *Keeton v. State*, 749 S.W.2d 861, 868 (Tex. Cr. App. 1988).

[10] 545 U.S. 231 (2005).

First, we do not need to compare jurors that exhibit all of the exact same characteristics. If the State asserts that it struck a black juror with a particular characteristic, and it also accepted nonblack jurors with that same characteristic, this is evidence that the asserted justification was a pretext for discrimination, even if the two jurors are dissimilar in other respects. Second, if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful *voir dire* examination on that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination. Third, we must consider only the State's asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors.[11]

The primary reason asserted by the State for striking Venire Members McCraney, Riser, and Jackson was that they were among those venire members who circled a specific answer to a specific question on the jury questionnaire.[12] The question asked, "With reference to the death penalty, which of the following statements best represents your feelings?" McCraney, Riser, and Jackson chose the answer, "Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could assess it under the proper circumstances." A venire member's responses to a written questionnaire can be valid grounds for a peremptory challenge.[13] Here, the State struck all venire members who answered this way. Because the appellant has not shown that these three minority venire members were treated differently from non-minority venire members, he has not demonstrated that the prosecutor's stated reason was a pretext for discrimination.

---

[11] *Reed v. Quarterman*, 555 F.3d 364, 376 (5th Cir. 2009).

[12] In the appellant's brief, he incorrectly states that one of the three, McCraney, circled a different answer.

[13] *Jasper v. State*, 61 S.W.3d 413, 422 (Tex. Cr. App. 2001). In particular, we have previously denied a *Batson* claim where the State's reason for using a peremptory challenge was that a venire member circled an identical answer. In *Camacho v. State*, 864 S.W.2d 524, 529 (Tex. Cr. App. 1996), we held that the appellant did not satisfy his burden of persuasion in a comparative juror analysis where all venire members who circled a "bad" response to this question, including non-black venire members, were struck by the State.

The State said that it struck Venire Members Vation and Morrison for affirmatively stating on the jury questionnaire that they opposed the death penalty. Here, too, the State struck all venire members who answered this way. Therefore, the appellant has again failed to demonstrate that the prosecutor's stated reason was a pretext for discrimination.

The remaining two minority venire members of whose strikes the appellant complains provided unique and distinguishing answers during the *voir dire* process.

Venire Member Long said that a defendant's voluntary intoxication would preclude her from assessing the death penalty. Contrary to the appellant's assertions, such a definitive position was not taken by a fellow venire member whom the State did not strike.

Venire Member Rivera made inconsistent and contradictory statements about her beliefs on capital punishment, including, at one point, stating that she had religious and moral convictions against the death penalty. The appellant fails to cite any similarly situated venire member whom the State did not strike.

Therefore, comparative analysis does not support the appellant's contention that the trial court's rulings were erroneous.

### b. Juror Patterson

While the trial court denied seven of the appellant's *Batson* challenges, it upheld his challenge to the State's striking of Venire Member Patterson. The trial court granted the challenge because "there [were] no African-American jurors on this jury and there was a disproportionate number of African-Americans who were struck." The court cautioned, however, that its ruling did not stem from a belief that the State had used its strikes in a racially discriminatory manner, but instead was a result of the court's obligation to seat a racially diverse

jury.

Now, on appeal, the appellant argues, "The exercise of even <u>one</u> peremptory challenge for racial reasons invalidates the entire jury selection and mandates a new trial" (emphasis in original). In response, the State urges that the trial court's grant of the *Batson* challenge was in error, and, regardless, that the grant of one *Batson* challenge does not automatically make the jury selection erroneous.

As the State correctly notes, the trial court's reasoning was in error. "Under *Batson*, courts are not to be occupied principally with the extent to which members of any identifiable race are actually represented on the jury, but with whether the State was racially motivated in the exercise of its peremptory challenges against even one venire member of discernible race."[14] Here, the trial court explicitly stated that it did not find the State's peremptory strike of Patterson to be racially motivated. The trial court's grant of the defense's *Batson* motion, then, does not invalidate the entire jury selection. Moreover, even if the State's peremptory challenge of Patterson had been racially motivated, it would be but one factor in the determination of whether the entire jury selection was invalid.[15] It would not, as the appellant contends, automatically indicate that all other peremptory strikes were racially motivated. Thus, because neither comparative-juror-analysis on the other seven *Batson* challenges nor the granted *Batson*

---

[14] *Linscomb v. State*, 829 S.W.2d 164, 167 (Tex. Cr. App. 1992).

[15] *See Watkins*, 245 S.W.3d at 455 ("On balance, we agree with the appellant that the trial court's action in placing [a struck juror] back on the jury is a circumstance that cuts in favor of a conclusion that the prosecutor's other peremptory challenges were race-based. But, given the colloquy above, we do not think it necessarily compels that conclusion, even in combination with other factors that support an argument of pretext. We regard it as a circumstance that weighs tenuously in the appellant's favor, to be factored into the totality of circumstances in deciding whether the trial court clearly erred in failing to find that prospective jurors... were excluded on account of their race.").

challenge for Patterson weighs in favor of a finding that the trial court's rulings were clearly

erroneous, points of error one through seven are overruled.

## B. Challenges for Cause

After seven weeks of examining venire members, the trial court qualified 47 from whom

to select a jury. The appellant used his 15 statutorily allotted peremptory strikes and was granted

one additional strike by the court. In 16 points of error, he now argues that 13 of the venire

members he struck, in addition to 3 venire members for whom he requested, but was not granted,

additional peremptory challenges, should have been excused for cause.

## 1. Standard of Review

A venire member may be challenged for cause for having a bias for or against the

defendant, or against the law.[16] The trial court should grant a challenge for cause if these biases

would be so strong as to substantially impair the panelist's ability to carry out his oath and follow

the court's legal instructions.[17] The proponent of a strike does not meet his burden "until he has

shown that the venireman understood the requirement of the law and could not overcome his

prejudice well enough to follow it."[18]

When reviewing the grant or denial of a challenge for cause, we examine the record of the

*voir dire* to determine if there is sufficient evidence to support the trial court's ruling.[19] Because

the trial court is present to observe the venire member's tone and demeanor, we give great

---

[16] TEX. CODE CRIM PROC. art 35.16; *see also Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Cr. App. 1998)
(interpreting "bias against the law" to mean "refusal to consider or apply the relevant law").

[17] *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Cr. App. 2004).

[18] *Feldman v. State*, 71 S.W.3d 738, 747 (Tex. Cr. App. 2002).

[19] *Id.*, at 744.

deference to decisions made regarding venire members whose answers are vacillating, unclear, or contradictory.[20]

To show harm for the erroneous denial of a challenge for cause, the appellant must show that the trial court's failure to strike a challengeable juror forced him to use a statutorily-allotted peremptory strike on the challengeable juror, which left him unable to strike an objectionable juror who then sat on the jury.[21] Because the trial court in this case granted the appellant one peremptory strike in addition to his statutory allotment of 15, the appellant must show that the trial court improperly denied two challenges for cause.[22]

## 2. "Mitigation Impaired"

For most of the 16 challenged venire members, the appellant raises multiple issues. Before addressing the appellant's complaints about specific venire members, we shall first address an issue that the appellant raises regarding fifteen of the venire members we discuss below, namely that they were "mitigation impaired." What the appellant seems to mean by this phrase is that the venire members would be biased against the mitigation special issue.[23] One venire member, Vessels, could not think of circumstances that would sufficiently mitigate against a death sentence for someone convicted of capital murder. Fourteen other venire members – Desmond, Noble, Henry, McGuire. Davison, McDonald, Randeals,[24] Cantwell, Konkle, Bedford,

---

[20] *Id.*

[21] *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Cr. App. 2007).

[22] *Id.*

[23] *See* TEX. CODE CRIM. PROC. art. 37.071(e)(1).

[24] Both parties spell this venire member's name "Randleas." In the trial record, however, it is spelled

(continued...)

Livingston, Stockton, Hodges, Winfield – said that they did not believe that particular factors mentioned by the appellant, such as voluntary intoxication, age, upbringing, or a history of abuse could ever sufficiently mitigate against a death sentence for someone convicted of capital murder.

Each of these fifteen, however, said that they could listen to the mitigating evidence and answer the special issues in accord with the law and the facts. There is no requirement that venire members be able to think of sufficiently mitigating circumstances on their own, or that they find any particular circumstance to be sufficiently mitigating.[25] We do not find the appellant's allegation of mitigation-impairment for any of these fifteen venire members to be evidence of a bias against the law. As mitigation impairment was the only basis for points of error 15, 18, 20, and 21, we overrule these points.

### 3. Specific Challenges

### a. Desmond

In his eighth point of error, the appellant argues that Venire Member Desmond should have been struck for cause because he would always answer the future-dangerousness special issue "yes" if he found the appellant guilty. The appellant did not present this complaint to the trial court; therefore we will not address it.[26] We overrule point of error eight.

---

[24](...continued)
"Randeals."

[25] *See, e.g., Threadgill v.* State, 146 S.W.3d 654, 668 (Tex. Cr. App. 2004); *Standefer v. State*, 59 S.W.3d 177, 181 (Tex. Cr. App. 2001) (also noting, "whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry"); *see also Raby v. State*, 970 S.W.2d 1, 3 (Tex. Cr. App. 1998).

[26] *See* TEX. R. APP. P. 33.1(a)(1); *Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Cr. App. 2009) (a complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial).

### b. Noble

In his ninth point of error, the appellant argues that Venire Member Noble should have been struck for cause because she: 1) would always answer the future-dangerousness special issue "yes," 2) would always find a police officer more credible than other witnesses, and 3) had heard about the case on television and had discussed the case with co-workers. The appellant raised only the first of these complaint to the trial court, though, and it is thus the only claim that is preserved for our review.[27]

Throughout her extensive individual *voir dire* examination, Noble gave conflicting answers about her ability to refrain from automatically answering the first special issue "yes." During questioning by the State she asserted that she would be able to follow the law and the "presumption that the life sentence is the proper thing to do." Later, during questioning by the defense, however, Noble stated that if presented with evidence that one person had killed another, she thought her answer to the future dangerousness issue "would be yes."

In reviewing challenges for cause, particular deference is given to the trial court's ruling where, as here, the potential juror's answers were vacillating, unclear or contradictory.[28] The trial court did not abuse its discretion in denying the appellant's challenge to Venire Member Noble. We overrule point of error nine.

### c. Henry

In his tenth point of error, the appellant argues that Venire Member Henry should have been struck for cause because he: 1) would always find a police officer more credible than any

---

[27] *See* TEX. R. APP. P. 33.1(a)(1).

[28] *Threadgill*, 146 S.W.3d, at 667(citing *Feldman*, 71 S.W.3d at 744).

other witness, 2) would automatically give the death penalty if he found the appellant guilty, and 3) strongly believed in the death penalty. The second and third grounds were not objected to before the trial court, and are therefore not preserved for our review.[29] Thus, we will analyze only the appellant's first complaint.

In Henry's jury questionnaire and during his *voir dire* examination he stated that he would automatically believe a police officer over a defendant. Later, however, after an admonishment by the trial judge, Henry reversed course and stated that he would wait to assess a witness's credibility until after the witness was on the stand. The trial court overruled the defense's challenge for cause. We find that Henry's potential prejudices were not so clear as to make the trial court's decision an abuse of discretion. We overrule the appellant's tenth point of error.

### d. McGuire

In his eleventh point of error, the appellant argues that Venire Member McGuire should have been struck for cause because he would always answer the future-dangerousness special issue "yes," and rated himself a "10" when asked how strongly he supported the death penalty. The appellant did not object on these grounds before the trial court, and they have therefore not been preserved for our review.[30] Point of error eleven is overruled.

### e. Davison

In his twelfth point of error, the appellant argues that Venire Member Davison should have been struck for cause because of the member's very strong support of the death penalty. The

---

[29] *See* TEX. R. APP. P. 33.1(a)(1).

[30] *Id.*

appellant did not object on this ground before the trial court. Therefore the point has not been preserved for our review, and we will not address it.[31] We overrule the appellant's twelfth point of error.

### f. Randeals

In his fourteenth point of error, the appellant argues that Venire Member Randeals should have been excused for cause because she would automatically answer the future-dangerousness issue "yes" if she found the appellant guilty of capital murder, and because she had a bias toward law enforcement. The appellant's second contention was not presented to the trial court, and therefore it is not preserved for our review.[32]

During her individual *voir dire* examination, Randeals initially stated that she would automatically answer the future-dangerousness issue "yes" if she found the appellant guilty of capital murder. Later during her *voir dire* examination, however, Randeals stated that she would wait to hear all evidence before deciding the issue. We find that Randeals's potential prejudices were not so clear as to make the trial court's decision an abuse of discretion. We overrule the appellant's fourteenth point of error.

### g. Konkle

In the appellant's sixteenth point of error, he argues that Venire Member Konkle should have been struck for cause because he would automatically answer the future-dangerousness special issue "yes."

During his individual *voir dire* examination, Konkle stated that he would not need to hear

---

[31] *Id.*

[32] *Id.*

anything more than the facts of the offense to find that the appellant would be a future danger to society. Contrary to the appellant's contention, this did not make Konkle unfit to serve, as the facts of the offense alone can be sufficient to support a finding of future dangerousness.[33] Moreover, these were not Konkle's only statements on the subject. Later, he stated that he would listen to the evidence before making any decisions as to the future-dangerousness special issue. We overrule the appellant's sixteenth point of error.

### h. Bedford

In his seventeenth point of error, the appellant argues that Venire Member Bedford was challengeable for cause on numerous grounds. The appellant did not challenge Bedford for cause during jury selection, however.[34] The appellant has therefore failed to preserve his claim, and we overrule his seventeenth point of error.[35]

### i. Stockton

In his nineteenth point of error, the appellant argues that Venire Member Stockton should have been struck for cause because she could not give the trial her fair attention due to the "pressures of work and finances," and was "very pro-death penalty."

#### *i.* Personal Pressures

The appellant first argues that Stockton should have been struck for cause because she

---

[33] *See Cooks v. State*, 844 S.W.2d 697, 712 (Tex. Cr. App. 1992) (citing *Santana v. State*, 714 S.W.2d 1 (Tex. Cr. App. 1986)).

[34] In the appellant's brief, he quotes to a portion of the record where he allegedly challenged Bedford for cause. The cited portion, however, is the appellant's challenge for cause of venire member Cantwell The appellant did not challenge Bedford for cause, though he did exercise a peremptory strike on Bedford.

[35] To preserve error on denied defense challenges for cause, an appellant must demonstrate that he "asserted a clear and specific challenge for cause." *Sells v. State*, 121 S.W.3d 748, 758 (Tex. Cr. App. 2003).

would have had to work each day after serving on jury duty. The appellant reasons that this

would have made it difficult for Stockton to give her full attention to the trial.

Personal financial issues are not specifically enumerated in the Code of Criminal

Procedure as a ground of challenge for cause.[36] A challenge for cause may be properly asserted

on grounds which are not specifically enumerated in the Code of Criminal Procedure, however, if

it is based on facts that show that the prospective juror would be "incapable or unfit to serve on

the jury."[37] These challenges, though, are ordinarily addressed to the sound discretion of the trial

judge.[38]

During Stockton's *voir dire* examination, the trial judge questioned her on her ability to

serve as a juror:

| | |
|---|---|
| Court: | Do you think serving on this jury would pose such a severe economic hardship on you that it might affect your ability to sit as a juror in this case? |
| Stockton: | If it went beyond two weeks, it would. |
| Court: | Well, we don't necessarily think it will. |
| Stockton: | Okay. |
| Court: | But we kind of say that will be our cutoff date. It might, but for the purposes of our conversation, we are saying up to two weeks. So, you just tell me. |
| Stockton: | I can probably manage two weeks, but beyond that I can't. It would pose a financial hardship. |

---

[36] *See* TEX. CODE CRIM. PROC. art. 35.16.

[37] *Allridge v. Stat*e, 850 S.W.2d 471, 484 (Tex. Cr. App. 1991) (venireman preoccupied with business); *Nichols v. State*, 754 S.W.2d 185, 193 (Tex. Cr. App. 1988) (venireman preoccupied with personal problems).

[38] *Allridge*, 850 S.W.2d, at 484-85; *Nichols*, 754 S.W.2d, at 193.

In her juror questionnaire, Stockton made similar pronouncements. Most notably, she stated that, though she would have to work nights if selected as a juror, it would not affect her concentration.

Venire Member Stockton was very clearly anxious about the prospect of serving on a jury for a lengthy trial, and the potential impact it could have on her family's well-being. Yet, she was also very clear that this would not affect her ability to serve as a juror. We are not convinced by the evidence of her hesitation to find that the trial court abused its discretion in failing to find her disqualified.

<em>ii</em>. Support of Capital Punishment

The appellant next argues that Venire Member Stockton was unfit to serve as a juror because of her statements indicating a strong support for capital punishment. He offers no authority supporting this proposition, though, and, moreover, provides no excerpts from the record that demonstrate that Stockton improperly favored capital punishment. Instead, the appellant provides only a few brief quotations indicating that Stockton did not approve of her tax dollars being used to pay for the "luxuries" enjoyed by prison inmates. Furthermore, our own review of the record did not find any impermissible bias. The appellant has failed to provide us with sufficient law and facts to overrule the trial court's determination that Stockton was fit to serve as a juror. The appellant's nineteenth point of error is overruled.

j. Vessels

In his twenty-second point of error, the appellant argues that Venire Member Vessels should have been struck for cause because he automatically would answer the future-dangerousness special issue "yes."

During his individual <em>voir dire</em> examination, Vessels stated that he believed there was a

probability that criminals would repeat their crimes. Later, however, Vessels stated that he would decide the future-dangerousness issue based on all of the evidence. We afford great deference to the trial court in determining whether vacillating venire members are fit to serve as jurors.[39] We overrule the appellant's twenty-second point of error.

### k. Blevins

In his twenty-third point of error, the appellant argues that the trial court erred in denying his challenge for cause against Venire Member Blevins. The appellant did not challenge Blevins for cause during jury selection, however. The appellant has therefore failed to preserve his claim, and we will not address his twenty-third point of error.[40]

### l. McDonald

Because the appellant must show that the trial court erroneously denied at least two challenges for cause in order to be entitled to relief,[41] we need not address the appellant's remaining point of error regarding venire member McDonald. We overrule point of error thirteen.

### C. Constitutional Challenges to the Jury

In his twenty-fourth and twenty-fifth points of error, the appellant asserts that "the jury as constituted was biased or prejudiced which deprived appellant of a fair trial" in violation of "the United States Constitution" and Article I, Section 10 of the Texas Constitution. He asserts that the statutory *voir dire* errors he complained of are also constitutional errors. The appellant

---

[39] *Feldman*, 71 S.W.3d, at 744.

[40] To preserve error on denied defense challenges for cause, an appellant must demonstrate that he "asserted a clear and specific challenge for cause." *Sells v. State*, 121 S.W.3d 748, 758 (Tex. Cr. App. 2003).

[41] *See Saldano*, 232 S.W.3d, at 99.

provides us with no authority for these propositions. Having found no error in *voir dire*, we overrule these points of error.

### III. TRIAL ISSUES

### A. Expert Witnesses on Diminished Capacity

In his twenty-sixth point of error, the appellant argues that the trial court erred in denying his request to present expert testimony on the subject of his diminished capacity at the time of the offense. There is no defense of "diminished capacity" in Texas, other than insanity.[42] Evidence of a mental disease or defect may be relevant and admissible to rebut or disprove the defendant's culpable *mens rea*,[43] but the present case, involving a question of voluntary intoxication, is governed by a specific statute.

Penal Code section 8.04(a) says, "Voluntary intoxication does not constitute a defense to the commission of crime."[44] Intoxication is further defined as a "disturbance of mental or physical capacity resulting from the introduction of any substance into the body."[45] In *Ramos v. State*, we construed this statute as prohibiting any attempt to use intoxication to rebut or disprove a defendant's *mens rea*.[46] We held that the defendant's contention was contrary to long-standing

---

[42] *Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Cr. App. 2008).

[43] *Id.,* at 594. Such evidence may still be excluded under other evidentiary rules, however, such as Texas Rule of Evidence 403. *Id.* at 595.

[44] TEX. PENAL CODE § 8.04(a).

[45] *Id.*, § 8.04(d)

[46] 547 S.W.2d 33, 33-34 (Tex. Cr. App. 1977).

Texas law that was recodified by section 8.04 of the Penal Code.[47] We have since relied upon *Ramos* and the statute in subsequent cases to reject legal-sufficiency claims based upon intoxication,[48] and we said in *Skinner v. State* that "Texas Penal Code § 8.04(a) bars the use of evidence of voluntary intoxication to negate the culpable mental state of a crime."[49]

The appellant requested that the trial court make an advance ruling on the admissibility of two expert witnesses, Dr. John Roache and Dr. Lance Platt. The appellant sought to introduce testimony that he was under the influence of marijuana and PCP at the time of the victims' shootings, calling into question whether he possessed the necessary *mens rea* to commit capital murder. Because the experts' testimony was proffered at the guilt stage of trial to show that appellant's intoxication from marijuana and PCP use prevented him from forming the applicable *mens rea*, the evidence was inadmissible. Point of error twenty-six is overruled.

## B. The Appellant's Television Interviews

In his twenty-seventh point of error, the appellant argues that the numerous interviews he granted to television news reporters should not have been admitted during the State's case-in-chief. Specifically, the appellant argues that these reporters were *de facto* agents of the State, and, as such, were required to properly *Mirandize* the appellant in compliance with the United States Constitution and the Texas Code of Criminal Procedure.

The appellant offers no authority to support this contention. The only authority cited by

---

[47] *Id.*, at 33-34, 34 n.2.

[48] *Tijerina v. State*, 578 S.W.2d 415 , 416-17 (Tex. Cr. App. 1979); *Hawkins v. State*, 605 S.W.2d 586, 588-89 (Tex. Cr. App. 1980). *See also Rojas v. State*, 986 S.W.2d 241, 247 (Tex. Cr. App. 1998)("argument that [the defendant's] intoxication made him incapable of forming the necessary intent is not viable under a legal sufficiency analysis").

[49] 956 S.W.2d 532, 543 (Tex. Cr. App. 1997).

the appellant is *State v. Hernandez*,[50] a case in which a news reporter was found *not* to be an agent of the State. Further undermining the appellant's argument is the description of the conduct of the journalist in *Hernandez*, which was more suspect than that of the reporters in the appellant's case and yet was still deemed not to have risen to the level of State agency.[51]

The State, on the other hand, relies on our decision in *Escamilla v. State*.[52] In *Escamilla*, we examined the *Hernandez* opinion and concluded that creation of an agency relationship between law enforcement and non-law enforcement personnel depends on the existence of an agreement between them at the time of the elicitation.[53] Here, all four interviewers testified that they had no such agreement with law enforcement personnel, and the appellant points to no evidence of any agreement. We overrule the appellant's twenty-seventh point of error.

### C. Photographs of Items Seized from the Appellant's Cell

In his twenty-eighth point of error, the appellant argues that the trial court erred in overruling his objection to the introduction of photographs of items seized from his jail cell. The appellant acknowledges that prisoners have no right of privacy in their cells.[54] He argues that, because he was a pre-trial detainee rather than a prisoner, and because the search was conducted at the behest of the district attorney's office for purposes of trial preparation, it violated his

---

[50] 842 S.W.2d 306, 315-316 (Tex. App. – San Antonio 1992, pet. ref'd).

[51] In *Hernandez*, a sheriff on duty at the jail passed a note from the reporter to the defendant with the reporter's phone number and a request for a television interview. The appellant then called the reporter and made self-incriminating statements. *Hernandez*, 842 S.W.2d at 309-310.

[52] 143 S.W.3d 814 (Tex. Cr. App. 2004).

[53] *Id*., at 824.

[54] *Hudson v. Palmer*, 468 U.S. 517, 525-526 (1984).

limited right to privacy. In support of this argument, the appellant cites to *United States v. Cohen*,[55] in which the Second Circuit held that a prison detainee retains an expectation of privacy in his cell sufficient to challenge an investigatory search initiated by the prosecution.[56]

We are not bound by that court's decisions,[57] however, and we agree with the State that our opinion in *Soria v. State*[58] is instructive. In *Soria*, we held, broadly, that a shakedown search of a pretrial detainee's cell does not violate the Fourth Amendment or due process.[59] The facts of this case do not persuade us to create an exception to that holding. The record reflects that the District Attorney's investigator requested that an already-planned shakedown be rescheduled for earlier in the day, when he could attend and take photographs. We overrule the appellant's twenty-eighth point of error.

## D. Photographs of Prison

In the appellant's twenty-ninth point of error, he argues that photographs of the Polunsky Unite of the Texas prison system offered by the State at the punishment phase of trial were irrelevant and had prejudicial impact substantially outweighing probative value.[60]

---

[55] *United States v. Cohen*, 796 F.2d 20 (2d Cir. 1986).

[56] *Id.*, at 24.

[57] *See Ex parte Evans*, 338 S.W.3d 545, 552 (2011) (citing *Magouirk v. Phillips*, 144 F.3d 348, 361 (5th Cir. 1998) (state courts are not bound by United States Circuit Court precedent when making a determination of federal law)).

[58] 933 S.W.2d 46, 60 (Tex. Cr. App. 1996).

[59] *Id.*

[60] The State urges that we dismiss this point of error as inadequately briefed for failing to clearly set forth any argument. While we agree that it is not entirely clear on what grounds the appellant complains, we believe we can ascertain the appellant's intended argument from context clues.

The trial court ruled the photographs admissible based on relevance and probative value outweighing any prejudicial impact, indicating an analysis according to Texas Rules of Evidence 401 and 403. In his brief, the appellant

(continued...)

## 1. Standard of Review

A trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard.[61] If the ruling is within the zone of reasonable disagreement, an appellate court will not disturb it.[62] When a trial court decides not to exclude the evidence, finding that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice, this decision will also be given deference.[63]

## 2. Rule 401

Only relevant evidence is admissible.[64] Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[65] Therefore, to be relevant, evidence must be material and probative.[66] Evidence is material if it is "shown to be addressed to the proof of a material proposition, i.e., any fact that is of consequence to the

---

[60](...continued)
cites to Rule 401 itself, and to *Sells v. State*, 121 S.W.3d 748 (Tex. Cr. App. 2004), a case including Rule 401 and Rule 403 analyses. Because we conclude that the appellant means to argue that the admission of the photographs violated Texas Rules of Evidence 401 and 403, we will analyze the claim under that framework and decline to dismiss this point of error as inadequately briefed.

[61] *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Cr. App. 2003).

[62] *Id.*

[63] *Id.*

[64] TEX. R. EVID. 402.

[65] TEX. R. EVID. 401.

[66] *Miller v. State*, 36 S.W.3d 503, 507 (Tex. Cr. App. 2001).

determination of the action."[67]

During the punishment phase of trial, the State introduced 29 photographs of the Polunsky Unit of the Texas prison system, which houses male prisoners who have been sentenced to death. In arguing that the photos were not relevant, the appellant lifts a block quote from *Sells v. State*,[68] replacing "videotape" with "multitude of photographs":

> The multitude of photographs was not offered as information about the individual defendant or about how the individual defendant might be handled. It portrayed only one aspect of an entire system and offered only general information about some procedures used in that system. That others have been controlled in the prison system or that certain procedures are in place without specifically connecting those procedures to appellant was not evidence of consequence to the jury's factual determination of whether appellant would pose a continuing threat to society.

In response, the State argues that the photographs were relevant to the jury's required determination of the probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society. As the State correctly notes, we have held that "society" includes both prison and non-prison populations.[69] The State further urges that the photographs offered by the State were exhaustive in their detail of life in prison, and were used by the State to aid the assistant warden in his testimony concerning life at the Polunsky Unit. We agree with the State.

### 3. Rule 403

Under Texas Rule of Evidence 403, evidence, although relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

---

[67] *Id*.

[68] 121 S.W.3d 748 (Tex. Cr. Ap. 2004).

[69] *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Cr. App. 2010).

issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[70] A trial court, when undertaking a rule 403 analysis, must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.[71] These factors may well blend together in practice.[72]

We understand the extent of the appellant's argument to be that we should follow our earlier opinion in *Sells* and find that the photographs of the Polunsky Unit had prejudicial impact substantially outweighing their probative value. The State responds that the *Sells* opinion is entirely distinguishable, and we agree. In *Sells*, we held that it was not an abuse of discretion for the trial court to exclude the defense's 57-minute video of the administrative segregation unit of a Texas prison.[73] Here, the trial court allowed the State's photographs of the entire prison unit. Moreover, while urging us to follow our *Sells* decision, the appellant never specifies how the photographs were prejudicial. Our own analysis of the record and exhibits does not reveal any prejudicial impact. We overrule the appellant's twenty-ninth point of error.

---

[70] TEX. R. EVID. 403; *see also Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Cr. App. 1991) (rule 403 carries presumption probative value of relevant evidence is not substantially outweighed by other factors).

[71] *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Cr. App. 2006).

[72] *Id.*, at 642.

[73] *Sells*, 121 S.W.3d, at 766.

## E. Crime Scene Photographs

In his thirtieth through thirty-third points of error, the appellant argues that the trial court erred in allowing the State to introduce various photographs of the murder victims' autopsies and the crime scene. The appellant's argument begins by describing 29 photographs that defense counsel challenged, unsuccessfully, on various grounds at trial. The appellant then provides a sampling of case law explaining Texas Rule of Evidence 403. He concludes that "the trial court erred in allowing the State to introduce these 12 color photographs."[74]

### 1. Standard of Review and Applicable Law

Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.[75]

A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case.[76] The admissibility of

---

[74] In arguing that the appellant's thirtieth through thirty-third points of error are improperly briefed, the State notes that, after listing 25 allegedly unduly prejudicial photos, the appellant argues that an unspecified twelve should not have been admitted. We count 29 photos in the appellant's initial list. Further complicating matters is the discovery that the appellant's complaints on appeal do not, exactly, match the photographs objected to at trial. Additionally, the trial judge's rulings do not always comport with the appellant's objections.

[75] TEX. R. EVID. 403.

[76] *Davis v. State*, 313 S.W.3d 317, 331 (Tex. Cr. App. 2010).

photographs over an objection is within the sound discretion of the trial court,[77] and we will not reverse the trial judge's decision so long as the ruling was within the zone of reasonable disagreement.[78]

## 2. Autopsy Photographs

Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself.[79] Nonetheless, at trial, the appellant objected to the admission of several autopsy photos of the victims. The State responded that the photographs were "necessary for the medical examiner to explain her findings," and the trial court ruled that the photographs were more probative than prejudicial. The trial court further commented that "[m]urder cases are gruesome by their very nature .... There is nothing we can do about that .... It is what it is."

Each of the 25 autopsy photographs offered by the State at trial depicts a victim and his wounds in differing angles and scope. They were selected from over a hundred photographs for their usefulness in assisting the medical examiner's testimony. They are gruesome, clearly, but they portray no more than the gruesomeness of the injuries inflicted by the suspect. Thus, we find that the trial court's decision to admit them was within the zone of reasonable disagreement and was not an abuse of discretion.

## 3. Crime Scene Photographs

The appellant also complains of seventeen crime-scene photographs of the victims offered at trial. As with the autopsy photographs, each photograph is a unique depiction of the

---

[77] *Id.*

[78] *Kemp v. State*, 846 S.W.2d 289, 306 (Tex. Cr. App. 1992).

[79] *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Cr. App. 2009) (citing *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Cr. App. 1997).

wounds inflicted by the suspect. The State argued that it selected each photograph from more than seventy original crime-scene photographs because of their usefulness in assisting testimony and indicating the appellant's specific intent in murdering and robbing the victims. Like the autopsy photographs, the crime-scene photographs are gruesome, but they are no more gruesome than necessary to show the extent of the appellant's crimes. We find that the trial court's decision to admit the exhibits was within the zone of reasonable disagreement and was not an abuse of discretion. We overrule the appellant's thirtieth through thirty-third points of error.

## F. Sufficiency of the Evidence

In his thirty-forth point of error, the appellant argues that the evidence was insufficient to support his conviction. Specifically, the appellant argues that the State failed to prove a nexus between the victims' murder and the accompanying robbery, as is required to prove capital murder.

### 1. Standard of Review

Under *Jackson v. Virginia*, when assessing whether evidence is legally sufficient to support a conviction, we assess all of the evidence in the light most favorable to the verdict to determine whether "*any* rational trier of fact could find the essential elements of the crime beyond a reasonable doubt."[80] This standard accounts for the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[81] Therefore, in analyzing legal sufficiency, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the

---

[80] 443 U.S. 307, 319 (1979) (emphasis in original).

[81] *Id*.

evidence when viewed in the light most favorable to the verdict."[82]

Our review of "all of the evidence" includes evidence that was properly and improperly admitted.[83] When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and defer to that determination.[84] Direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."[85]

### 2. Applicable Law and Analysis

A person commits the offense of capital murder if he intentionally commits murder in the course of committing or attempting to commit robbery.[86] A person commits robbery if, in the course of committing theft, he intentionally, knowingly, or recklessly causes bodily injury to another.[87] The State must prove a nexus between the murder and the theft, *i.e.*, the murder was committed in order to facilitate the taking of the property.[88] The appellant argues that the State failed to prove this nexus.

The appellant told three Dallas journalists that he, alone, had murdered the victims, and

---

[82] *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Cr. App. 2007).

[83] *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Cr. App. 2001).

[84] *Jackson*, 443 U.S., at 326.

[85] *Hooper*, 214 S.W.3d, at 13.

[86] *See* TEX. PEN. CODE § 19.03(a)(2).

[87] *See id*. § 29.02(a)(1).

[88] *Cooper v. State*, 67 S.W.3d 221, 223 (Tex. Cr. App. 2002); *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex. Cr.. App. 1986).

that he and his cousin had specifically traveled to Garland that day with the intent to commit a

robbery. The appellant further told the journalists that he had rifled through the victims' pockets

after shooting them. Each of these journalists testified at his trial, accompanied by video

recordings of their interviews with the appellant. Additionally, the appellant's conviction is

supported by circumstantial evidence, most notably the victims' empty pockets and the

appellant's possession of Swan's identification card and vehicle.[89] A rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt.

The appellant further contends that "the evidence shows that [the appellant was] high on

PCP at the time of the offense," and that "[t]here was no DNA belonging to [the appellant] on the

weapon." These contentions do not negate the evidence of guilt. We overrule the appellant's

thirty-fourth point of error.

## G. Testimony on Gang Affiliation

In his thirty-fifth point of error, the appellant argues that the trial court erred in admitting

testimony during the punishment phase of trial regarding his gang affiliation. In his thirty-sixth

point of error, he argues that, after having been admitted, this testimony should have been subject

to a limiting instruction.

First, the appellant argues that Detective Barrett Nelson of the Dallas Police Department

Gang Unit was not qualified as an expert on the subject of gang affiliation. The appellant did not

object to Detective Nelson's testimony on this basis at trial.[90] The appellant has therefore failed

---

[89] *See Cooper*, 67 S.W.3d, at 223-224 (theft occurring immediately after a murder will support an inference that the murder occurred during the course of a robbery).

[90] At a pre-trial hearing, the appellant objected to Detective Nelson's testimony as invalid under Rules 401 and

(continued...)

to preserve this argument, and it will not be considered.[91]

The appellant next argues, "'Guilt by associaton' has been rejected in Texas," and that the admission of testimony regarding the appellant's gang affiliation was thus more prejudicial than probative. It is unclear on what grounds, exactly, he complains, but given the prejudicial-versus-probative language, and the appellant's Rule 401 and Rule 403 objections at a pre-trial hearing, we interpret the appellant's argument to be that the introduction of evidence of his gang membership violates Rules 401 and 403 of the Texas Rules of Evidence.

### 1. Relevance

Evidence of a defendant's gang membership may be relevant and admissible at the punishment stage of a trial to show the character of the accused.[92] Evidence of gang membership allows the jury to make an informed decision regarding the character of the guilty party when determining the appropriate punishment to assess.[93]

Once evidence of gang membership is established, the prosecution must then present to the jury evidence of the activities of the gang generally.[94] "It is essential for the jury to know the

---

[90](...continued)
403 of the Texas Rules of Evidence, as well as under the First and Fourteenth Amendments to the United States Constitution. The appellant did not explain how, exactly, Detective Nelson's proffered testimony would run afoul of the First and Fourteenth Amendments. The appellant further requested a limiting instruction from the trial judge should Detective Nelson's testimony be admitted. Before Detective Nelson testified during the punishment phase of trial, the trial judge ruled that he would not give a limiting instruction.

[91] *See* TEX. R. APP. P. 33.1(a).

[92] *Jones v. State*, 944 S.W.2d 642, 652-53 (Tex. Cr. App. 1996); *Beasley v. State*, 902 S.W.2d 452, 456 (Tex. Cr. App. 1995).

[93] *See Anderson v. State*, 901 S.W.2d 946, 950 (Tex. Cr. App. 1995).

[94] *See Beasley*, 902 S.W.2d, at 456; *Anderson*, 901 S.W.2d at 950 ("Although relevant, gang membership alone would be meaningless to a jury which has no knowledge of the gang's purpose or activities.").

types of activities the gang generally engages in so that they can determine if [the defendant's] gang membership is a positive or negative aspect of his character, and subsequently his character as a whole."[95] It is not necessary to link the accused to the bad acts or misconduct generally engaged in by gang members, so long as the jury is (1) provided with evidence of the defendant's gang membership, (2) provided with evidence of the character and reputation of the gang, (3) not required to determine if the defendant committed the bad acts or misconduct, and (4) only asked to consider reputation or character of the accused.[96]

In the instant case, Detective Nelson testified that a great deal of evidence indicated the appellant was a member of the Gangster Disciples of the Folk Nation network of gangs: 1) The appellant made statements and hand signals self-identifying himself as a member. 2) The appellant had several tattoos indicating membership in the gang. 3) Notebooks found in the appellant's possession at the time of arrest contained numerous drawings linking the appellant to the gang. 4) Drawings on the walls of the appellant's cell linked the appellant to the gang. Detective Nelson then described the activities and reputation of the gang itself, testifying that the Gangster Disciples were "impressive" in their organization, and explaining that "they're teaching their younger generation how to be a gang member." Detective Nelson further testified that the gang was heavily involved in criminal enterprises in order to fund their organization; specifically, he testified that they "turned to violence, selling drugs, robberies and murders."

Through Detective Nelson's testimony, the State established evidence of the appellant's gang membership, evidence of the activities of the gang generally, and evidence of the character

---

[95] *Beasley*, 902 S.W.2d, at 456.

[96] *Id.,* at 457.

and reputation of the gang. The State did not ask Detective Nelson for evidence linking the appellant to specific bad acts or misconduct, nor did the State ask the jury to consider anything beyond the appellant's reputation or character in light of his association with the gang. Thus, the State successfully met the requirements for admitting evidence of the appellant's gang membership,[97] and we find that Detective Nelson's testimony was, indeed, relevant.

## 2. Probative Value and Prejudicial Effect

Having determined that evidence of the appellant's gang membership was relevant, we are still left to determine whether its probative value outweighed its prejudicial effect.[98] Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial.[99] "The term 'probative value' refers to the inherent probative force of an item of evidence – that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation – coupled with the proponent's need for that item of evidence."[100] "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[101] It is only when there exists a clear disparity between the degree of unfair prejudice of the offered evidence and its probative value that Rule 403 is applicable.[102]

---

[97] *See Beasley*, 902 S.W.2d, at 456-457.

[98] *See* TEX. R. EVID. 403.

[99] *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Cr. App. 1997).

[100] *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Cr. App. 2007).

[101] *Id.,* at 880.

[102] *Davis v. State*, 313 S.W.3d 317, 331 (Tex. Cr. App. 2010).

Evidence of the appellant's gang membership was obviously unfavorable to the appellant, but it was not unfairly prejudicial. It came as part of a larger examination of his character and behavior, in which rap lyrics written by the appellant were pored over in detail. All of this evidence, taken together, revealed a man whose life was rife with violence, drug dealing, and pride in living as a modern-day outlaw. The evidence of the appellant's gang membership was but one of the factors that allowed the jury to rationally gauge the probability that appellant would be a danger in the future. It was not so unfairly prejudicial that there was a clear disparity between the degree of the prejudice and its probative value. The trial court did not abuse its discretion in admitting this evidence. The appellant's thirty-fifth point of error is overruled.

### 3. Limiting Instruction

In the appellant's thirty-sixth point of error, he argues that, having been admitted, the testimony on gang affiliation should have been subject to a limiting instruction. Rule of Evidence 105(a) states that, "when evidence which is admissible ... for one purpose but not admissible ... for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."[103] One purpose of limiting instructions is to ensure that the jury does not rely on admitted evidence for an impermissible purpose.[104]

While the parties and the trial court discussed a "limiting instruction" at the pre-trial hearing, it is not clear from the record how the appellant wanted to limit the use of the gang

---

[103] TEX. R. EVID. 105(a).

[104] *Lewis v. State*, 815 S.W.2d 560, 566 (Tex. Cr. App. 1991).

evidence. From the cases[105] that were cited to the trial court, and now in the appellate briefs, it appears the appellant may have wanted the jury instructed on how to consider evidence of extraneous offenses. Assuming, without deciding, that this point of error is properly preserved in the record and presented in the appellant's brief, and that the trial court erred in not giving a limiting instruction, that error would be subject to a harm analysis.[106]

When a trial court errs in failing to provide a limiting instruction, reversal of the judgment of the trial court is warranted only if the error affected the substantial rights of the parties.[107] A substantial right is affected "when the error had a substantial and injurious effect or influence in determining a jury's verdict."[108] We will not overturn a verdict if we have fair assurance that the error in question either did not influence the jury or, if it did influence the jury, that its effect was only slight.[109]

In the instant case, if there were error, we do not believe that the error provided anything more than a slight influence on the jury, if any influence at all. Detective Nelson's testimony did not improperly implicate the appellant in any extraneous offenses, and, more significantly, his testimony was only a small part of the State's case at punishment. We hold that the trial court's refusal to provide a limiting instruction did not have a substantial and injurious effect or influence on the jury's verdict. We overrule the appellant's thirty-sixth point of error.

---

[105] *Beasley v. State*, 902 S.W.2d 457 (Tex. Cr. App. 1995); *Anderson v. State*, 901 S.W.2d 946 (Tex. Cr. App. 1995); *Siena v. State*, 266 S.W.3d 72 (Tex. App. – Houston [1st Dist.] 2008, pet. ref'd).

[106] *Jones v. State*, 944 S.W.2d 642, 653 (Tex. Cr. App. 1996).

[107] TEX. R. APP. P. 44.2(b).

[108] *King v. State*, 953 S.W.2d 266, 271 (Tex. Cr. App. 1997).

[109] *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Cr. App. 1998).

## H. Sufficiency of the Evidence – Future Dangerousness

In the appellant's thirty-seventh point of error, he argues that the evidence was legally insufficient to support the jury's affirmative answer to the future-dangerousness special issue.[110] Specifically, the appellant argues that the jury's finding was unreasonable because he had "no prior violent criminal background," and because a defense witness testified that the appellant "essentially was a low risk for future dangerousness."

The State responds that the brutal nature of the appellant's crimes, alone, was sufficient to support a finding of future dangerousness, and that, moreover, the appellant's conduct since his arrest supports the jury's finding. We agree.

In assessing the legal sufficiency of the evidence to support future dangerousness, we view the evidence in the light most favorable to the jury's findings.[111] We must determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society whether in or out of prison.[112]

Sometimes, sufficient evidence of future dangerousness can be inferred from the offense itself.[113] Here, the appellant confessed to murdering two defenseless men in order to steal their car so he could return home. The appellant described to reporters how he shot each man a second

---

[110] Tex. Code Crim. Proc. art. 37.071.

[111] *Estrada v. State*, 313 S.W.3d 274, 284 (Tex. Cr. App. 2010)

[112] *Druery v. State*, 225 S.W.3d 491, 506-07 (Tex. Cr. App. 2007)

[113] *See Dinkins v. State*, 894 S.W.2d 330, 359-61 (Tex. Cr. App. 1995) (evidence of premeditated and brutal murders of two women, including multiple gunshot wounds at close range of one of the victims, was sufficient to support affirmative answer to future-dangerousness special issue and the "character evidence uniformly favorable to" the defendant was "alone insufficient to mitigate the premeditation and brutality of the offense").

time after their initial wounds failed to kill them immediately. Then, when the appellant was sure

the victims had expired, he rifled through their pockets.

The probability of appellant's future dangerousness also can be inferred from evidence

showing a lack of remorse.[114] In the same television interviews discussed above, the appellant

coldly and calmly walked reporters through the murders. When asked if he had anything to say to

the victims' families, the appellant responded, "Fuck 'em." To the specific question by the

interviewer, "Do you have any remorse, none whatsoever?" the appellant only shook his head.

Finally, in one of the interviews the appellant discussed the probability that he would

commit criminal acts of violence that would constitute a continuing threat to society:

| | |
|---|---|
| Reporter: | What do you think's going to happen to you now? |
| Appellant: | Whatever they throw at me. Hopefully the death penalty. |
| Reporter: | Hopefully? |
| Appellant: | Yea. 'Cuz they give me life I'ma' kill somebody else. Straight up. I'm telling you right now. I can't do no motherfuckin' life. I'ma' go crazy. |
| Reporter: | So you want the death penalty? |
| Appellant: | They better. Pick one [the appellant holds up each arm, presumably referencing the lethal injection method of execution]. Or you gon' have some more bodies. |
| Reporter: | Oh, in here you're gonna kill someone? |
| Appellant: | Nah. Whichever penitentiary they send me to. They better put me on death row. Tell you just like I'ma tell the judge. |

We hold that the State presented sufficient evidence to support the jury's finding that the

---

[114] *See Martinez v. State*, 327 S.W.3d 727, 735 (Tex. Cr. App. 2010); *Trevino v. State*, 991 S.W.2d 849, 853-54 (Tex. Cr. App. 1999).

appellant posed a future danger to society. The appellant's thirty-seventh point of error is overruled.

## I. Court Costs

In the appellant's thirty-eighth point of error, he argues that the court costs imposed by the trial court – and later garnished from his inmate trust fund – violated his right to due process. In the appellant's thirty-ninth point of error, he argues that these court costs violated the Texas Government Code because he was not sufficiently notified of their imposition. In the past, however, we have held that issues stemming from the garnishment of inmate trust fund accounts are not criminal in nature, and that we therefore lack jurisdiction to consider such arguments.[115] Our sister court has agreed.[116] The appellant has not persuaded us otherwise. We overrule the appellant's thirty-eighth and thirty-ninth points of error.

In the appellant's fortieth point of error, he argues that the evidence was legally insufficient to support the imposition of these court costs. Unlike issues related to the collection of costs, challenges to the sufficiency of the evidence to support the imposition of costs *are* criminal law matters.[117] Here, however, the appellant offers in support of his contention only one off-topic case citation.[118] Furthermore, we agree with the State that there is no evidence that the imposed $460.00 in court costs is "anything more than the statutorily-imposed costs the trial court was obligated to order [the appellant] to pay." We overrule the appellant's fortieth point of

---

[115] *Johnson v. Tenth Judicial District Court of Appeals at Waco*, 280 S.W.3d 866, 874 (Tex. Cr. App. 2008).

[116] *Harrell v. State*, 286 S.W.3d 315, 318 (Tex. 2009).

[117] *Armstrong v. State*, 340 S.W.3d 759, 766 (Tex. Cr. App. 2011).

[118] *Mayer v. State*, 309 S.W.3d 552 (Tex. Cr. App. 2010).

error.

## IV. FEDERAL ISSUES

In points of error forty-one through fifty-six, the appellant raises various constitutional challenges to Texas' death-penalty statutes already decided by this court,[119] and invites us to revisit our prior holdings.

Point of error forty-one is, "The statute under which [he] was sentenced to death is unconstitutional in violation of the cruel and unusual punishment prohibition of the Eighth Amendment because it allows the jury too much discretion to determine who should live and who should die and because it lacks the minimal standards and guidance necessary for the jury to avoid the arbitrary and capricious imposition of the death penalty."

Point of error forty-two is, "The statute under which [he] was sentenced to death" violates the Eighth Amendment "because the mitigation special issue sends mixed signals to the jury thereby rendering any verdict reached in response to that special issue intolerable and unreliable."

Point of error forty-three is, "The statute under which [he] was sentenced to death" violates "the due process requirements of the Fourteenth Amendment because it implicitly puts the burden of proving the mitigation special issue on Appellant rather than requiring a jury finding against Appellant on that issue under the beyond a reasonable doubt standard."

Point of error forty-four is, "The trial court erred in denying [his] motion to hold Article 37.071 Sec. 2([e]) and ([f]) concerning burden of proof unconstitutional as a violation of Article One Sec. 10 and Sec. 13 of the Texas Constitution."

Point of error forty-five is, "The Texas death penalty scheme violates due process

---

[119] *See Saldano v. State*, 232 S.W.3d 77, 107-109 (Tex. Cr. App. 2007).

protections of the United States Constitution because the punishment special issue related to mitigation fails to require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi [v. New Jersey*, 530 U.S. 466 (2000),] and its progeny."

Point of error forty-six is, "The Texas death penalty scheme violated [his] rights against cruel and unusual punishment and [to] due process of law under the Eighth and Fourteenth Amendments to the United States Constitution by requiring at least ten 'no' votes for the jury to return a negative answer to the punishment special issues."

Point of error forty-seven is, "The Texas death penalty scheme violated [his] rights against cruel and unusual punishment, [to] an impartial jury and to due process of law under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution because of vague, undefined terms in the jury instructions at the punishment phase of the trial that effectively determine the difference between a life sentence and the imposition of the death penalty."

Point of error forty-eight is, "The Texas death penalty scheme denied [him] due process of law, and imposed cruel and unusual punishment in violation of the Fifth, Eighth and Fourteenth Amendments of the United States Constitution because of the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against the imposition of the death penalty." In point of error forty-nine, the appellant claims that this also "denied [him] due course of law, and imposed cruel and unusual punishment, in violation of Article I, §§ 13 and 19, of the Texas Constitution."

Point of error fifty is, "The trial court erred in overruling appellant's motion to hold Art.

37.071 Sec. 2(e) and (f) unconstitutional because said statute fails to require the issue of mitigation be considered by the jury."

Point of error fifty-one claims that the mitigation special issue is "unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence." In point of error fifty-two, the appellant claims that the mitigation special issue is "unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because it permits the very type of open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia*[, 408 U.S. 238 (1972)]."

Point of error fifty-three is, "Texas' statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not permit meaningful appellate review."

Point of error fifty-four is, "The trial court erred in overruling appellant's motion to quash the indictment as being unconstitutional based on the enumerated constitutional defects of the Texas capital murder death penalty law."

Point of error fifty-five is, "The cumulative effect of the above-enumerated constitutional violations denied appellant due process of law in violation of the Fifth and Fourteenth Amendments of the United States Constitution." Finally, in point of error fifty-six, the appellant claims that this also denied him "due course of law under Article I, § 19, of the Texas Constitution."

We decline the appellant's invitation to review our prior decisions on these issues. Points of error forty-one through fifty-six are overruled.

V. CONCLUSION

We affirm the judgment of the trial court.

Delivered December 14, 2011.
Do not publish.